# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* A. A. BRINKLEY, Minor.

UNPUBLISHED
February 16, 2017

No. 333557
Clare Circuit Court
Family Division
LC No. 14-000092-NA

---

Before: MURPHY, P.J., and SAWYER and SWARTZLE, JJ.

PER CURIAM.

Respondent appeals as of right the order terminating his parental rights to his minor child under MCL 712A.19b(3)(c)(*i*), (g), and (j). Respondent raises two issues on appeal. First, he challenges the trial court's best-interest determination. Second, respondent claims a due process violation, arguing that petitioner and the court created a condition that led to termination of his parental rights. We affirm.

## I. GOVERNING STANDARDS

If a trial court finds that a single statutory ground for termination has been established by clear and convincing evidence and that it has been proved by a preponderance of the evidence that termination of parental rights is in the best interests of a child, the court is mandated to terminate a respondent's parental rights to that child. MCL 712A.19b(3) and (5); *In re Beck*, 488 Mich 6, 10-11; 793 NW2d 562 (2010); *In re Moss,* 301 Mich App 76, 90; 836 NW2d 182 (2013); *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). "This Court reviews for clear error the trial court's ruling that a statutory ground for termination has been established and its ruling that termination is in the children's best interests." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011); see also MCR 3.977(K). "A finding is clearly erroneous if, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made." *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009). In applying the clear error standard in parental termination cases, "regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989). The trial court must "state on the record or in writing its findings of fact and conclusions of law[,] [and] [b]rief, definite, and pertinent findings and conclusions on contested matters are sufficient." MCR 3.977(I)(1) (rule pertains to termination proceedings). "Whether proceedings complied with a party's right to due process presents a question of constitutional law that we review de novo." *In re Rood*, 483 Mich 73, 91, 763 NW2d 587 (2009).

-1-

## II. BEST-INTEREST DETERMINATION

Because respondent does not directly challenge the trial court's findings on the statutory grounds for termination, and because we ultimately reject respondent's due process challenge, *infra*, the findings relative to the statutory grounds stand. With respect to respondent's best-interest argument, we hold that the trial court did not clearly err in finding that terminating respondent's parental rights was in the child's best interests.

In regard to a child's best interests, we place our focus on the child rather than the parent. *In re Moss*, 301 Mich App at 87. The trial court may consider such factors as "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014).

In December 2014, the child was removed from respondent's care because of multiple instances of domestic violence, resulting at times in significant physical injuries. Respondent was on probation for one act of domestic abuse that involved the child's mother. Before removal, respondent had been provided with multiple services, including several safety plans, domestic violence counseling, intensive home-based Families First services, probation services, substance abuse assessment screens, financial assistance, and community mental health services. Respondent had ignored the plans and continued to engage in violent altercations with the child's mother even though a no-contact order was in place. Respondent's parental rights were terminated on June 3, 2016.

The trial court concluded that respondent was unable to properly parent the child because of an inability or unwillingness to change and control his behavior, which conclusion was consistent with his diagnosed personality disorder. Respondent had not sufficiently benefited from the four sessions of anger management counseling that was a requirement of his probation, as evidenced by the violent altercation that led to the child's removal in December 2014. Respondent argues that petitioner improperly focused on his relationship with the mother because the relationship had ended and she had voluntarily relinquished her parental rights on December 4, 2015. However, the end of respondent's involvement with the mother did not mark the end of his volatile and aggressive behavior. He exhibited an inability to control his anger throughout the proceedings. Respondent was belligerent with caseworkers and behaved inappropriately during parenting times. During one visit, the child became frightened and hid underneath a table when respondent yelled at an aide. He tried to grab the child out of the caseworker's arms. At another visit, law enforcement was called when respondent, who appeared to be under the influence of a substance, ignored three requests to hand the child over to the caseworker. The caseworker was frightened for the child's and her own personal safety because of respondent's aggressive demeanor. Moreover, the evidence supported the trial court's conclusion that respondent's new relationship was also volatile and unstable; the woman had a long domestic violence history. Moreover, she was named on a central registry for failing to protect other children. Also, she had reported to law enforcement that she and respondent

were having extreme difficulties after a domestic altercation in December 2015 during which she slapped respondent across the face and respondent threw a coffee cup on the driveway while she was leaving.

Respondent's behavior was consistent with a psychological evaluation indicating that he was emotionally immature, had a low frustration tolerance, and became increasingly impulsive from everyday stress. It was determined that he had limited ability to manage interpersonal relationships, had compromised social skills, and was unlikely to benefit from psychotherapy. It was noted that he showed little insight into his emotional problems and poor relationship choices.

Respondent argues that the trial court ignored the recommendation of the lawyer-guardian ad litem (LGAL) in February 2016 that it was not in the child's best interests to change the case goal from reunification to termination, as the child should have another chance to bond with her father through parenting time. Although the trial court allowed petitioner to file a termination petition, the court considered the LGAL's opinion and granted respondent additional parenting time if he provided two negative drug screens. The trial court also advised respondent:

> The treatment plan as previously ordered will continue to be ordered by the Court. So, Mr. Brinkley you have to continue to participate in the treatment. If you choose not to, that will come out at the termination hearing. So, the ball has been in your court and it continues to be there and it's up to you.

Treatment services and parenting time were offered before and after the supplemental petition was filed in late April 2016.

Respondent argues that the trial court ignored all of his treatment progress and that the court clearly erred in failing to consider his counseling, parenting skills classes, employment, and housing in making the best-interest determination. This argument ignores the extensive court record. There was considerable evidence that respondent failed to comply with and benefit from his treatment plan. Respondent's treatment goals included: proper management of his anger and frustrations; a drug and alcohol free lifestyle; maintaining healthy relationships free of domestic violence; and improving his parenting skills. Also, respondent was to undergo a substance abuse assessment and then follow all recommendations; was to submit to a psychological evaluation and follow all recommendations; and was to participate in individual counseling, anger management counseling, parenting classes, random drug screens, and parenting time. He was also to obtain employment and independent housing. For more than a year, respondent minimally complied with his treatment plan. He completed the psychological evaluation but failed to participate in other services. He did not stay in regular contact with caseworkers. He did not follow up with numerous substance abuse assessment referrals. He steadfastly believed that anger management counseling was unnecessary because he had completed four sessions as part of his probation. Respondent attended one individual therapy session in March 2016 but failed to follow up with additional counseling. He completed some of the parenting classes in July 2015, and said in February and April 2016 that he would complete the program but failed to do. Respondent had unrealistic expectations of children and did not respond well to parenting instruction offered during supervised parenting time. Respondent

-3-

never obtained full employment. He did not follow up with job search assistance offered through Michigan Works. Respondent never provided verification of employment, testifying only that he found jobs "here and there." Respondent did not have independent housing. The trial court properly concluded that respondent's home was not proper for the child. After more than 18 months, respondent was financially and emotionally dependent on his fiancé, who had only been employed full-time for three weeks, and his father, who had health issues. Respondent was living with his fiancée in her mother's home, along with two adults and up to six children, with an indication that he could be kicked out at any time. Moreover, the evidence supported the court's conclusion that the child had a minimal bond with the fiancé and her daughter.

The court found that respondent refused to take responsibility for his difficulties and shifted blame to others. The testimony indicated that he was inconsistent and that undependable characteristics remained unchanged. Given the duration of the child's time in care, respondent's lack of significant effort in and progress toward meeting his goals, the tenuous bond described by caseworkers, the fact that the child appeared to be thriving in her foster home and there was interest in adoption, and, perhaps most importantly, the concern that defendant's tendencies toward domestic violence had not been addressed, we cannot conclude that the trial court clearly erred in ruling that termination of respondent's parental rights was in the child's best interests.

III. DUE PROCESS

Respondent claims that petitioner violated his due process rights by creating a ground for terminating his parental rights. We disagree.

"[W]hen the state deliberately takes action with the purpose of 'virtually assur[ing] the creation of a ground for termination of parental rights,' and then proceeds to seek termination on that very ground, the state violates the due process rights of the parent." *In re B & J*, 279 Mich App 12, 19-20; 756 NW2d 234 (2008) (alteration in original). Respondent asserts that the court improperly considered the apparent lack of a parent-child bond, arguing that the bond was weakened because petitioner prevented him from having parenting time by placing the child in a geographically remote foster home. We first note that the lack of a parent-child bond was not particularly relevant with respect to *the grounds for termination*; rather, the absence of a bond pertained to the best-interest determination. Regardless, while the foster home location was a complication, efforts were made to facilitate visitation to strengthen the bond but the efforts were ultimately thwarted by respondent's actions.

The record shows that petitioner initially sought to place the child and her half-sister in foster care out of the county to safeguard the children from the domestic violence concerns of the family, and that the primary goal had been keeping the girls together. The placement was changed approximately six months later when the foster mother had a scheduled medical procedure, and the children were then placed in a foster home in East Jordan, which required respondent to travel more than an hour for parenting time. Respondent made several requests for the child to be moved to a closer foster home. It was determined that placement with a relative that respondent had identified was not appropriate.

At a May 4, 2015 dispositional hearing, respondent did not have any concerns regarding the child's placement. Petitioner was granted the discretion to require negative drug screens

before parenting time. The caseworker reduced parenting time from twice to once each week in response to respondent's reports that he was overwhelmed in attempting to complete other treatment plan services.

At a June 10, 2015 review hearing, respondent reported having some transportation issues and that it was difficult to participate in all of the services and parenting visits. The court directed petitioner to explore moving the children closer to the Clare County area, expressing concern that the situation would be setting respondent up for failure and asking that he identify suitable relatives for placement.

In July 2015, respondent appeared to be under the influence of a substance during parenting time. He refused to provide a drug screen, claiming that screens were unnecessary because he was no longer on probation. Respondent then said that he was not going to participate in any services until the child was moved back to Clare County. The caseworker had previously explained to respondent that there was no home available in Clare County and that it was in the child's best interests to remain in her current placement where she was thriving.

At an August 2015 motion hearing to suspend respondent's parenting time, petitioner was ordered to arrange parenting time, twice weekly, within 30 miles of Harrison, Michigan, and in a controlled environment. The court again expressed dissatisfaction with the distant placement. Petitioner was ordered to report all of the efforts made to relocate the child to Clare County. Respondent was ordered to provide negative alcohol and drug screens before each parenting session. Petitioner arranged for the child to be transported to Harrison so that respondent would not have to travel a great distance for parenting time.

There is no evidence that petitioner deliberately set out to thwart family reunification, as in *In re B & J*, by purposely placing the child at a remote foster home. The record shows that petitioner, despite repeated efforts, was unable to locate a suitable foster home in or closer to Clare County. Respondent was offered fuel cards if needed to participate in any services, including parenting time. In early September 2015, petitioner reported that attempts to locate a foster home closer to Clare County were unsuccessful. Thereafter, his parenting time was interrupted because of criminal charges averring that he had sexually abused his daughter's half-sister. His parenting time was reinstated on November 4, 2015, after the charges were dismissed.

Respondent claims that he was denied consistent parenting time. However, the record shows that except when criminal charges were pending, respondent was consistently offered parenting time. Respondent was unable to participate in parenting time in part because he did not comply with the court order to provide two consecutive negative drug screens. On November 19, 2015, he tested positive for THC and explained that he was in the process of obtaining a medical marijuana card. Respondent attended parenting time on December 2, 2015. Respondent was unable to participate in parenting time after December 2, 2015, because he repeatedly tested positive for THC. From November 2015 through March 2016, he repeatedly reported that he was getting a medical marijuana card. In March 2016, a caseworker tried to help respondent get the card as quickly as possible so that parenting time could resume, but respondent preferred to simply wait for the card rather than explore avenues for swifter approval. On April 26, 2016, respondent finally provided a copy of his medical marijuana card, which

indicated a start date of April 19, 2016. Respondent failed to appear for screens on March 24, April 5, April 13, April 22, April 29, May 7, May 12, and May 16, 2016. At the time of the termination hearing, respondent had not seen his child in six months. The parent-child bond was weakened because of respondent's inaction and not the child's foster home placement.

The record supports the trial court's conclusion that there was a lack of a parent-child bond. Respondent had a short and tenuous bond with the child at the inception of the case. The child was removed from his care when she was 22 months old. When she entered into care, the child was diagnosed with failure to thrive because of ongoing neglect. She was referred for an autism screening because of developmental delays, including a lack of verbal communication. The half-sister exhibited "parentrified" behaviors and had reported numerous instances when she was left alone to care for her sister. Before June 2015, the child appeared to be happy when she saw respondent. However, subsequently, the child would scream when put in her car seat in the parenting-time supervisor's car, and she became very clingy with her foster mother and did not respond well with foster family members for several days after her parenting time with respondent. The court properly considered the tenuousness of the parent-child bond when determining the child's best interests.

The trial court did not commit clear error requiring reversal, as respondent asserts, when it considered favorable aspects of the foster care home while making its best-interest determination. While it is inappropriate for a court to consider the advantages of a foster home in deciding whether a statutory ground for termination of parental rights has been established, such a consideration is appropriate for purposes of a best-interest determination. *In re Foster*, 285 Mich App 630, 634; 776 NW2d 415 (2009). The case manager testified that relative placement had been considered throughout the case. The child was thriving in her foster home where she had resided for more than one year. Her sleep issues had abated and her communication skills had markedly improved. The case manager opined that the foster parents would serve the child's interests well and noted that they desired to adopt her.

The record does not support respondent's claim that he was not given an opportunity to care for his child or that the state created the circumstances that impaired his ability to do so. As the psychological evaluation indicated, respondent tended to deny, rationalize, minimize, and escape from difficult situations. He had a faulty self-perception and skewed sense of reality. Throughout the proceedings, respondent was unwilling to acknowledge and take responsibility for his shortcomings and problems. There was ample evidence to support the trial court's conclusion that respondent had been unable or unwilling to provide the child with a safe, stable, and permanent environment. The state did not create this situation, and the trial court did not clearly err in determining that it was in the child's best interests to terminate respondent's parental rights.

Affirmed.

/s/ William B. Murphy
/s/ David H. Sawyer
/s/ Brock A. Swartzle