*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re JOHNSON, Minors.

UNPUBLISHED
July 28, 2022

No. 357524
Genesee Circuit Court
Family Division
LC No. 08-124209-NA

Before: MARKEY, P.J., and BOONSTRA and RIORDAN, JJ.

PER CURIAM.

Respondent-mother appeals by leave granted[1] the trial court's order terminating her parental rights to the minor children, JRJ, JJJ, and JJR, under MCL 712A.19b(3)(a)(*ii*), (c)(*i*), (g), and (j). We affirm.

## A. STATUTORY GROUNDS

Respondent argues that the trial court clearly erred when it found that there was clear and convincing evidence of a statutory ground to terminate her parental rights. We disagree.

In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been established by clear and convincing evidence. *In re Trejo,* 462 Mich 341, 355; 612 NW2d 407 (2000). This Court reviews the trial court's findings under the clearly erroneous standard. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Miller,* 433 Mich 331, 337; 445 NW2d 161 (1989).

The trial court terminated respondent's parental rights pursuant to MCL 712A.19b(3)(a)(*ii*), (c)(*i*), (g), and (j), which permit termination under the following circumstances:

---

[1] *In re Johnson,* unpublished order of the Court of Appeals, entered October 29, 2021 (Docket No. 357524).

(a) The child has been deserted under either of the following circumstances:

\* \* \*

(*ii*) The child's parent has deserted the child for 91 or more days and has not sought custody of the child during that period.

\* \* \*

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

\* \* \*

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The record supports the trial court's reliance on these statutory grounds.

Respondent's history with Children's Protective Services (CPS) dates back to 2008 when her oldest child, AK, was removed from her care for exposure to domestic violence and environmental neglect. The court took jurisdiction of AK, and respondent was given two years to participate in and benefit from services designed to remove the barriers to reunification. When respondent failed to establish that she benefited from the treatment plan, the court terminated her parental rights to AK in March 2010.

In the eight years that followed, respondent gave birth to the three children at issue in this appeal. Between 2013 and 2018, CPS investigated several complaints of neglect, improper supervision, and domestic violence. In March 2018, respondent was arrested and convicted of various offenses, including assault. In the criminal case, the court sentenced respondent to two years' probation and ordered her to participate in Genesee County's mental health court. Respondent had previously been diagnosed with schizoaffective disorder, bipolar disorder, and cannabis dependency. After sentencing, between April and June 2018, law enforcement responded to five domestic-violence calls at the home respondent shared with the children and their father.

In June 2018, the children were removed on an emergency basis after the police discovered them alone in the home.

Following these events, petitioner, the Department of Health and Human Services (DHHS), filed a petition to terminate respondent's parental rights. In exchange for removing the request for termination at the initial dispositional hearing, respondent agreed to enter a plea of admission to permit the trial court to exercise jurisdiction over the children. At the dispositional hearing that followed, the court ordered respondent to participate in a treatment plan designed to address her mental instability, domestic violence, poor anger management, and poor parenting skills. Further, respondent was required to comply with the terms of her probation and the requirements of the mental health court. She was also required to participate in anger management treatment, a domestic violence program, parenting classes, and individual counseling. Respondent's treatment plan required her to maintain communication with her caseworker and to obtain and maintain suitable housing and a legal source of income. Despite being offered a multitude of services and given an extraordinary amount of time to complete them, respondent was unable to demonstrate that she could properly parent her children or establish that they would be safe in her care.

An important goal of respondent's treatment plan was the improvement of her parenting skills. To address this goal, respondent was referred for parenting classes. Although she completed a parenting education program, the evidence clearly showed that she did not benefit from the services. This conclusion is supported by the fact that during the three years the children were in care, respondent did not consistently participate in parenting time. Indeed, she would go for weeks, sometimes months, with little or no contact with the children. Her absence took a toll on the children's well-being. So much so that the court instituted a requirement that respondent call in to confirm her attendance an hour before a scheduled visit. In the months preceding the termination hearing, respondent still failed to timely confirm her attendance: She simply canceled or failed to show for visits. The foster mother testified that although visitation times were set and consistent, respondent had difficulty maintaining the schedule and, at times, she required reminders. Even with this assistance, respondent's attendance at parenting time was described as "sporadic" at the time of the termination hearing.

Not only did visits provide respondent with an opportunity to be with her children, they also offered respondent a unique opportunity to practice and improve her parenting skills. Moreover, they would have given DHHS the ability to assess respondent's progress in this regard. Respondent's failure to consistently attend parenting time demonstrated that she had not improved her parenting skills to the point that the children would be safe if returned to her care.

Addressing her mental stability was another important component of respondent's treatment plan. Respondent had a long history of emotional instability, dating back to 2008. Much of respondent's treatment was governed by the mental health court. Respondent, however, was terminated from this program in July 2019 for noncompliance. This termination constituted a violation of her probation. Because she feared being jailed, respondent "went on the run" after she was terminated from the program. During this time, respondent also failed to attend court hearings and communicate with her foster-care caseworker. As a consequence of these actions, months passed where respondent was not taking her psychotropic medications or receiving mental health treatment.

Respondent argues on appeal that she was successfully addressing her mental health issues. She notes that in the seven months since returning to the mental health court, she was participating in intensive mental health services and making progress. While there was some evidence that respondent was making progress in the few months before the April 2021 termination hearing, the evidence was not so compelling to warrant a finding that she had achieved the emotional and mental stability necessary to parent three children under the age of seven.

In September 2020, 14 months after she was terminated from the program, respondent requested and was permitted to return to the mental health court. From this readmission until the termination hearing in April 2021, respondent appeared to be complying more seriously with her mental health treatment and making some progress. But she still had eight months until her anticipated graduation from the program and discharge from her probation. Respondent admitted at the termination hearing that she continued to suffer from depression, which would often bring on crying spells. Further, during the review period ending in March 2021, the caseworker noted that respondent was "prone to outbursts of anger when she perceives that she is not getting what she wants and she will often make impromptu decisions that can hinder her mental health." Respondent also admitted to the caseworker that when she was stressed and overwhelmed, she became forgetful. Respondent notes that the mental-health-court coordinator testified that she made excellent progress during the second admission into the program. The coordinator, however, admitted that she was only familiar with respondent's mental health treatment and that she was not familiar with respondent's progress with her treatment plan in the child protective proceeding. In particular, the coordinator was not aware that respondent was not consistently visiting her children, attending review hearings, or communicating with the foster-care caseworker. Further, the coordinator testified that respondent had only recently begun dialectical behavior therapy, an intensive therapy that helps a client dig deep into any trauma experienced in childhood and young adulthood. The coordinator later testified that it took some people a long time to deal with the horrendous things from their past. It is clear from the record that at the time of the termination hearing, respondent had not adequately addressed her mental health issues.

During the three years the children were wards of the court, respondent continued to have unstable housing. Nothing had changed at the time of the termination hearing. For several months leading up to the termination hearing, respondent refused to disclose her address to the caseworker. Respondent testified that at the time of the termination hearing, she was living with her aunt. This housing, however, was not appropriate for three children. Respondent admitted that while she was capable of caring for her children, she was not prepared to do so because she did not have suitable housing. Further, only a week before the commencement of the termination hearing, respondent was participating in an in-patient program. Respondent's probation officer testified that respondent had been admitted into this 30-day program because of positive marijuana screens and unstable housing. At the time of the termination hearing, respondent had not achieved the treatment goal of obtaining and maintaining suitable housing.

Clear and convincing evidence supported the trial court's findings that at the time of termination the conditions that led to the adjudication continued to exist, that respondent could not properly care for her children, and that the children would be at risk of harm if returned to her care. Further, the record similarly established that there was no reasonable likelihood that respondent would be in a position to safely parent her children within a reasonable time. At the time of termination, the children had been in care for approximately three years. During that time,

respondent was unwilling or unable to address the barriers to reunification. Additionally, respondent's unstable history was longstanding, dating back to at least 2008. During the earlier proceeding, respondent was similarly offered years of services from which she did not benefit. There was no reasonable likelihood that respondent would shed her longstanding behavioral patterns if given more time. Accordingly, the trial court did not clearly err when it found clear and convincing evidence to terminate respondent's parental rights pursuant to MCL 712A.19b(3)(c)(*i*), (g) and (j). "A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014). "Similarly, a parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *Id.* at 711.

Petitioner also sought termination of respondent's parental rights under MCL 712A.19b(3)(a)(*ii*), but it is unclear whether the court relied on desertion as a basis for terminating respondent's parental rights. The court mentioned this statutory ground in passing, but it did not appear to address it in much detail. In any event, there was clear and convincing evidence to terminate respondent's parental rights under this ground. After respondent was terminated from the mental health court in July 2019, she went months without visiting the children, attending court hearings, or communicating with her foster-care caseworker. In effect, respondent deserted her children. See, e.g., *In re Laster,* 303 Mich App 485, 492; 845 NW2d 540 (2013). Furthermore, "desertion is an intentional or willful act." *In re B & J*, 279 Mich App 12, 18 n 3; 756 NW2d 234 (2008). Respondent admitted that after she was terminated from mental health court, she intentionally left the state because she feared being incarcerated. The record demonstrated an intentional and complete failure to participate in services during this time. Accordingly, there was clear and convincing evidence to terminate respondent's parental rights under MCL 712A.19b(3)(a)(*ii*).

## B. BEST INTERESTS

Next, respondent argues that the trial court clearly erred by finding that termination of her parental rights was in the children's best interests. We again disagree.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The court may consider several factors when deciding if termination of parental rights is in a child's best interests, including the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. *In re Olive/Metts,* 297 Mich App 35, 41-42; 823 NW2d 144 (2012). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. See *In re Jones,* 286 Mich App 126, 131; 777 NW2d 728 (2009). "The trial court should weigh all the evidence available to determine the children's best interests." *In re White,* 303 Mich App at 713. In considering a child's best interests, the trial court's focus must be on the child and not the parent. *In re Moss,* 301 Mich App 76, 87; 836 NW2d 182 (2013). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *Id*. at 90. This Court reviews for clear error

a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones,* 286 Mich App at 129.

The trial court did not clearly err when it found that termination of respondent's parental rights was in the children's best interests. To properly thrive and develop, children require a safe, stable, and permanent home environment. The evidence demonstrated that respondent was not able to meet these needs. During the three years the children were wards of the court, respondent was offered and did participate in many services designed to remove the barriers to reunification. But respondent did not benefit from the services offered. She had yet to achieve the stability necessary to care for herself, let alone three young children.

At the time of termination, JRJ was seven years old; JJJ was five, and JJR had just turned three years. After being shuffled around to at least three other placements, JRJ and JJJ were placed together in the same foster home in July 2018. JJR joined his older brothers in July 2019 after a brief return placement with respondent was unsuccessful. JRJ and JJJ had reached an age where they were beginning to question their future placement, and it was clear that respondent's continued instability was taking its toll on the older children. Except for a few months where JJR was with respondent, this child had spent nearly his entire young life in foster care. The children required stability, permanence, and finality, which respondent could not provide. The foster home, however, was more than meeting the children's needs. Not only were all three children placed together, which strengthened the sibling bond, a bond had formed with the entire foster family. Moreover, the foster parents had expressed a desire to adopt all three boys.

Of particular concern was respondent's ability or willingness to meet the children's mental health needs. JRJ and JJJ had abandonment and anger issues. Both boys were participating in therapy. JJJ was prescribed medication to address behavioral issues. At the time of the termination hearing, JJR had been referred but had yet to start infant mental health treatment. JRJ's and JJJ's therapists both expressed opinions that the boys required continued treatment. The foster-care worker voiced a legitimate concern that respondent would not continue or seek out mental health care for her children. Her concerns were not unfounded. Early in the case, it was apparent that the children were struggling with mental health issues. Initially, the children's father authorized treatment. When the treatment authorization was up for renewal, neither parent was willing to authorize continued treatment. Consequently, the issue was brought before the court, and the children were then able to continue with their therapy. Respondent contends that she has no problem with the boys' receiving therapy, but she continues to believe that her children should not be medicated. During the proceedings, however, respondent was unwilling to facilitate mental health treatment in any form. Accordingly, there remained a very serious probability that she would not cooperate in seeking mental health treatment for her children if they were returned to her care.

Termination was the only avenue by which to insure that the children's needs would be met and that they would achieve stability and finality. Accordingly, the trial court did not clearly err when it found that a preponderance of the evidence demonstrated that termination of respondent's parental rights was in the children's best interests.

We affirm.

/s/ Jane E. Markey
/s/ Mark T. Boonstra
/s/ Michael J. Riordan